## CONTRIBUTIONS TO MAKE UP A SHORTAGE.

[Circuit Court of Lucas County.]

HENRY RICHTER v. PHOENIX BUILDING & LOAN CO.

Decided, February 25, 1905.

*Embezzlement—Compounding a Felony—Criminal Distinguished from Civil Liability—Contributions to make up Defalcation—Not Illegal, When—Executed Illegal Contracts—Court Assumes Function of Jury, When—Trial.*

1. Where at the close of the evidence each party by motion asks for a directed verdict in his favor, the court assumes the place of the jury, and the question thereafter presented is not whether there was a scintilla of evidence either way, but whether the court was authorized on the evidence to take the action which was taken.

2. Contributions for the purpose of making good a defalcation are not illegal so far as the making good of the civil liability of the defaulter is concerned; and where such contributions are made by members of a building association acting in their individual capacity, such action is not in the nature of compounding a felony, in the absence of any promise or agreement on the part of the building association not to institute or cause to be instituted criminal proceedings against its secretary, whose shortage has thus been made good.

3. Where a member of a building association, at the solicitation of other members of the association and acting in common with them, cancels the credit which he has in the association with the direction that the amount thereof be used to make good the shortage of the secretary of the association, he can not thereafter maintain a suit to set aside the cancellation of his credit on the ground that the contract which he thereby entered into was illegal because compounding a felony.

4. Were it true that such action amounted to compounding a felony, still no relief could be granted, for the reason that where an illegal contract has been executed the court will leave the parties where it finds them.

HULL, J.; HAYNES, J., and PARKER, J., concur.

This action was brought by the plaintiff to recover $1,160 from the defendant, the building and loan company, which amount the plaintiff claims it owes him. The plaintiff was a

member of the defendant company, a corporation of the state of Ohio, and on April 4, 1904, he was, by the books, and in fact, entitled to a credit in the way of deposits and otherwise, in the company. In September following he withdrew, as was his right under the rules of the company, and demanded his money, which was refused, on the ground that he had canceled and receipted for it for a good and valuable consideration, and in that way has received his money. This was denied by Richter; the case went to trial before the court and a jury, and at the conclusion of the testimony a motion was made by each party to direct a verdict in its favor. The finding of the court upon that motion was the same as the finding of a jury would be upon the evidence; and the question is, whether the court was authorized by the evidence to take the action that was taken—not whether there was a scintilla of evidence either way, but, each party having made this request, the court then stands as a jury. The court sustained the motion of the defendant and directed the jury to return a verdict in its favor. The controversy here is about a certain contract or contracts—papers—which Richter signed. It is claimed by Richter that he receipted for this money—canceled his claim against the bank—by virtue of an illegal contract, one contrary to law and public policy, therefore he is not bound by it; that it was null and void and of no effect legally, that he had a right to recover his money.

This contract grew out of a defalcation by one Mensing, who had been secretary of the company and was a defaulter to the amount of 30,177, and after it was discovered Richter with some nineteen others entered into an agreement whereby they were to subscribe and pay enough money to make up this defalcation; this was done and Richter was approached on April 4 by two persons and notified of the condition of affairs in the bank, requested to sign this paper which I have referred to, which he did, and it is claimed that this was in furtherance of an arrangement to compound a felony to save Mensing from a criminal prosecution and from being sent to the penitentiary, and therefore, was contrary to public policy and void.

On the other hand, defendant in error claims that the purpose was, not to compound a felony; that if there was any such

purpose on the part of the parties who signed this paper, including Richter, that the bank itself was not a party to it, therefore, not affected by it.

It is claimed by plaintiff in error further, that there were certain errors committed at the trial of the case, and especially in the exclusion of testimony, and it is also claimed that the court erred in directing the verdict as it did.

As I have said, Richter was a stockholder in the bank—a member of the organization, perhaps, would be the better term—and he had to his credit in the bank at the time this paper was signed $1,162. He was approached by the two men who requested him to sign this contract, which recites that:

"WHEREAS, It is represented that H. R. Mensing, as secretary of the Phoenix Building & Loan Company, is short in his accounts with said company in approximately the sum of $30,000; and

"WHEREAS, Said H. R. Mensing has agreed to assign and transfer unto Herman R. Klauser, as trustee for the benefit of all the undersigned, all of his property of every kind and character whatsoever, giving unto the said Herman R. Klauser full authority to sell the same for the best price that can be obtained therefor and pay over unto the assigned the proceeds of said sale, less the amount of his other indebtedness, *pro rata* upon the amounts herein subscribed.

"*Now, Therefore,* We, the undersigned, in consideration of the conveyance by the said H: R. Mensing unto the said Herman R. Klauser, trustee, his property as above provided, and in order to raise the amount of his defalcation for the purpose of reimbursing the Phoenix Building & Loan Company, agree to pay the amount set opposite our names. It being understood, however, that the sums hereby subscribed are not to be paid unless the total amount of said defalcations are raised."

The most of these parties had signed this paper before it was presented to Richter, and he signed it and enough other stockholders of the association subscribed sufficient to raise the amount of the defalcation, and as it seems ,to us from the evidence, in pursuance of this agreement which was entered into on April 4, 1904, Richter, on the evening of that day went to the association building, or bank building as it is called in the record sometimes, and turned over to the association his

book in which he kept the record of his transactions with the
bank and which showed that it was indebted to him $1,162, and
there was written in the book, which he signed, a cancellation
of his account and the writing recited that the book was turned
over and surrendered to the association for the purpose of hav-
ing it canceled; everything was done in this writing that could
be done to receipt to the bank for this money and constituting
a payment of it on the part of the bank to him.

It does not appear that the banking association, as such, had
any knowledge of this transaction as between Richter and the
other parties who signed this paper—none of the officers of the
bank said anything to him about it, did not approach him;
did not request him to sign it; no action was taken by the as-
sociation providing for anything of this kind, and so far as
the evidence discloses, it seems to have been a voluntary act
on the part of these parties who signed it, they having the
purpose in view, probably, of saving Mensing, the defaulting
secretary, from any criminal prosecution. He was an acquain-
tance of theirs and apparently a friend. The writing recites
that he is "short" this $30,000.

Another purpose that they had in view was to save the asso-
ciation from disaster and bankruptcy. They were all stock-
holders in the association and interested in its property, all
except Klauser, the trustee, and he also subscribed; and as
appears, if this defalcation had not been made up the associa-
tion would have been bankrupt or gone into the hands of a
receiver with the usual result. I say these parties who sub-
scribed were all interested. Klauser himself was not a stock-
holder. The man who had been acting as trustee and to whom
Mensing conveyed his property also subscribed $5,000, and the
other subscriptions run in various amounts, enough to make
up the whole amount of the defalcation.

In rebuttal, the plaintiff, Richter, sought to show that another
paper writing was drawn up about the same time, perhaps the
same day, which recited that Mensing was a defaulter and short
in his accounts $30,177. This evidence the court excluded,
and that is one of the errors complained of. And it recites
further:

"AND, WHEREAS, Certain persons have loaned unto the said Herman R. Mensing said amount of $30,177, in order to enable him to make good such shortage and to repay and reimburse the said The Phoenix Building & Loan Company to the amount of his said indebtedness thereto, so that the said Herman R. Mensing may escape prosecution therefor.

"AND, WHEREAS, The said Herman R. Mensing has this day, together with his wife, Minnie C. Mensing, executed and delivered unto the said Herman R. Klauser their promissory note for said sum of $30,177 as evidence of their indebtedness unto the said persons who loaned said sum as above mentioned, it is agreed," etc.

This is signed by Klauser and Mensing. It further recites that in order to partially repay the amount of money so loaned and to secure the payment of said indebtedness Mensing agrees to personally convey and deliver unto Klauser as trustee all of his property, both real and personal, and Klauser agrees to take the property and sell it for the best price he can obtain therefor and after taking out of the proceeds the $13,000 that Mensing owes, to apply the balance towards the payment of this defalcation or debt to the bank. That is the substance of that writing, making Klauser a trustee for that purpose, and this is the agreement referred to in the other paper which Richter signed.

Now, there is no evidence that the bank had anything to do with this paper or that the officers of the bank took any part in it, officially at least, or that the association as such had anything to do with it. There were stockholders of the association present when it was drawn and perhaps some directors; but stockholders or directors, meeting in that unofficial way, would have no power to make a legal contract which would bind the association and certainly would have no power to make an illegal contract, if there was anything illegal about this contract. This paper creating this trusteeship was excluded by the court. There was no evidence that the association was connected with the drafting of this paper in any way. In order to bind it— in order to make that contract legal so far as they were concerned—it must appear that the association was a party to it in some way; and this not appearing, we think the court was

correct in holding that it was immaterial. What it was that influenced Richter to sign the paper that he did sign, was not material so far as the bank was concerned. Neither was it material so far as the association was concerned, or from a legal point of view, that he signed it with a hope of saving Mensing from a criminal prosecution.

In order to make a contract illegal on the ground that it is compounding a felony, it must appear that there was some kind of an agreement on the part of the party or parties who had been injured by the commission of the crime. The mere hope that it may result in preventing a criminal prosecution is not sufficient. It is not a crime for friends of a man to raise money to pay up a loss of this kind. Mensing owed this debt to the bank. Although there was a criminal liability, there was a civil liability and there was no law against his friends raising the money, if they could, and making up the defalcation, any more than there was a law against Mensing going to the bank with the hope of paying the amount of his defalcation; if there was no promise on the part of the injured party that they would not prosecute him in consideration of such payment.

After this agreement had been made, Richter went voluntarily to the building of the association and, pursuant to this contract canceled the indebtedness of the bank to him. The contract recites that the money is to be paid by these parties subscribing—presumably to the association, the injured party—and as each subscribed the amount that was coming to him from the association, the ordinary way to pay it would be to cancel the amount that the association owed each of them, which would work a payment.

There is another reason why Richter can not recover this amount back from the bank. The agreement and contract, so far as he is concerned, has been executed. It is well established that courts will not aid in the execution of an illegal contract— if this was an illegal one—but where an illegal contract has been made, or one made for an illegal consideration, and is fully executed, the courts will not assist a party in recovering back what he has paid, but will leave the parties where it finds them.

The second paragraph of the syllabus in the case of *Hooker* v. *DePalos*, 28 Ohio St., 251, reads as follows:

"The law will not aid a party to such contract, either in its enforcement whilst executory, or in its rescission when executed."

Referring to an illegal contract—and this seems to be the general law of the land, both in this state and elsewhere —that if parties have entered into an illegal contract and carried it out, have paid the money or given whatever consideration, was to be given in such contract, they will not be aided by the court in rescinding the contract or in recovering back whatever may have been paid. The courts refuse to recognize such contracts as a basis for execution or for rescission or any recovery. But, as I have suggested, it seems to me that there was nothing illegal or contrary to public policy in the contract or paper writing that Richter signed. There was no promise made to him of an illegal character; he was interested in the bank; he was interested in Mensing, and he, along with these other gentlemen, raised the money to make up this defalcation, raised the money to pay this debt that Mensing owed the association, and it seems to us in any view of it that the fact that it does not appear that the association as such was a party to this arrangement, must be fatal to Richter's claim.

Quite a large amount of testimony was excluded by the court. It was all in the line of showing that this was done for the purpose of preventing a criminal prosecution. Offers to prove were made by counsel showing that this was the object, but there was no offer to prove facts that tended to show that the association was a party to prevent a criminal prosecution or a party to these arrangements which were made. It seems to us that the action of the court of common pleas in directing a verdict was correct and we agree with the court in the opinion. pronounced at that time by the trial judge in his charge to the jury. The judgment of the court of common pleas will therefore be affirmed.

*J. P. Manton* and *J. P. Hanley,* for plaintiff in error.

*A. B. Capel* and *Southard & Southard,* for defendant in error.